ORIGINAL

August 17 2006, Thursday

Jeffrey D. Moffatt, Attorney
Attorney Alan Janaskie, Petitioner
43625 N Sierra Hwy, Suite A
Lancaster CA 93534
(661) 945-6121
FAX (661) 945-3019
EMAIL: Jeffreymbajd@hotmail.com
Ref: AR 20050009400

FILED
AUG 2 3 2006
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALAN JANASKIE
Petitioner

V. No. 06-602 C

SECRETARY OF VETERANS AFFAIRS, DEPARTMENT OF THE ARMY
Respondent

COMPLAINT

CONSTITUTIONAL VIOLATION/ VETERAN'S BENEFITS/ CORRECT MILITARY RECORDS/BACKPAY AND CORRECTION OF INJUSTICES, TO SMSGT/E8 ALAN JANASKIE.

OPENING STATEMENT

The purpose of this complaint is to correct military records for SMSGT/E8 Alan Janaskie, *(referred through out this document as SMSGT Janaskie,):* retroactive from Jan 31st 1983. This

suit is also seeking back pay and correction of injustices suffered by SMSGT Janaskie due to the failure to properly categorize SMSGT Janaskie's disabilities as related to Agent Orange Exposure. SMSGT Janaskie has submitted multiple requests for assistance by the Veterans Administration, (VA). Due to the understaffing of the VA, combined with failure by the VA and the Military, to provide documents when requested that prove SMSGT Janaskie's claims of exposure to Agent Orange Exposure are valid, Petitioner finds he is legally blind and dying while unable to get the proper medical care and benefits. The total inadequacy of the VA to properly address Petitioner's claims has been a failure to abide by Military, Federal and State Due Process requirements, as well as the U.S. Government's failure to abide by regulatory and statutory requirements, as well as failures to abide by the Geneva Convention. This case is also based on Constitutional violations. One of the violations stems from the inaccurate amount of reporting of Agent Orange use, such that 9,440,028 more liters have been sprayed than reported, The Extent and patterns of usage of Agent Orange and other herbicides in Vietnam, 2003 Nature, Vol 422 , 17 April 2003, Stellman page 682.

In Hamdan v. Rumsfeld 05-184, citing the Geneva Convention Article 3, Stevens noted that it explicitly says its terms apply even in a "conflict not of an international character." Justice Anthony Kennedy, in his concurring opinion, pointed out that violations of Article 3 were war crimes subject to severe punishment under statutes passed by Congress. Therefore, failure to provide for Military Veterans whom were poisoned by their own Government should be governed under the Geneva Convention Article 3 provisions.

1. COURT REVIEW OF VETERAN CLAIM.

This Court can review a denial of the Veterans Administration. This review may be performed under the standards of the Administrate Procedure Act which looks to determine if the following activities have taken place: (arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and unsupported by substantial evidence on the whole record; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law) in the U.S. Court of Federal Claims 28.U.S.C.S 1346 (a)(2) ("Little Tucker act) and 28.U.S.C.S 149(a)(1) (" Big Tucker Act').

Jurisdiction in the U.S. Court of Federal Claims is possible since there exists more than $1,800,000.00 for back pay, veterans' benefits, disability and other issues subject to remuneration.

2. JURISDICTION

This case is being brought under the Tucker Act, 28 U.S.C. 1491 (1988), since this case partially revolves around suit for money founded upon (1) the Constitution, (2) an act of Congress, (3) an Executive Order, (4) a Regulation of an Executive Department, or (5) any express or implied–in-fact contract with the United States. Members of the Uniformed Services claiming entitlements to military pay, or other compensation for services actually performed, can bring suit under the Tucker act, 28 U.S.C. 1491(a)(1)(1992).

3. INJUSTICES THAT SMSGT JANASKIE ENDURED WHILE SEEKING VETERAN'S BENEFITS

Injustices that SMSGT Janaskie endured while seeking Veteran's Benefits are contained in this document. Many individuals serving in the Veteran era face a dilemma similar to what Petitioner has faced. That dilemma focuses around serving in the Military, being exposed to toxins such as Agent Orange and, being denied access to medical care, as well as Veterans Benefits. A further dilemma exists in that Respondent has subverted attempts by Petitioner to get access to records showing Agent Orange exposure while in Thailand. Later in this document, various officials are disclosed stating how secret operations are in Thailand, and that there would be a concerted effort to not disclose Agent Orange operations outside the physical confines of Vietnam.

The genesis of this dilemma Petitioner faces comes from a Class Action suit brought individuals in 1984 for Agent Orange exposure. Amazingly, in this Class Action suit, documents showing exposure to Agent Orange both inside and outside of Vietnam were intentionally kept out of the records by various nefarious acts of the Federal Government. According to documents obtained from Admiral Zumwald's collection of documents, it appears the attorney who signed off on the fiction which established the Presumptive Test for the parameters of benefit recovery regarding Agent Orange Exposure, was actually discharged from the case prior to illegally signing a settlement with the Government on the case. The class members were livid with the offer of the Presumptive Test. The class members knew the settlement would not satisfy issues of Agent Orange Exposure, since the exposure existed

throughout the theater of operation, both inside and outside the boundaries of Vietnam and nefarious actions of the Federal Government were keeping incidents of exposure classified and out of reach, even to this day. This agreement has created an unbelievable uphill battle for Petitioner to prove his Agent Orange exposure.

Following the illegal signing of this Presumptive Test the signing Attorney was ultimately disbarred. Only after the signing of this agreement did the Service Herbs tapes become disclosed, partially showing even more Agent Orange Exposure, than had been admitted prior to the date of the supposed agreement. Only after the year 2000 has it been disclosed by Dr. Michaelk, that Ranch Hand, i.e. Agent Orange spraying took place in Thailand, however much of that information is still classified. However, as of yet, the Presumptive Test that the VA uses as a touch stone for all Agent Orange cases, has not been discarded, despite the fraud and still concealed documents by the Federal Government which surrounds the settlement agreement.

Petitioner, and others like him, have been saddled with a settlement agreement that was illegal, unauthorized, and made while the Government was still hiding and re-classifying, and classifying documents regarding Agent Orange exposure outside the boundaries of Vietnam. Petitioner, and others like him, have been saddled with the Presumptive Test. This test which arose out of the illegal and unauthorized settlement agreement, as previously explained. Discarding of the Agent Orange Presumptive Test has made progress and manifested itself in the 4-4 decision by the Supreme Court in 2004 DOW CHEMICAL COMPANY, et al.,

PETITIONERS v. DANIEL RAYMOND STEPHENSON et al. The court ordered more consideration of the claims of Joe Isaacson, a vice principal in Irvington, N.J. The court, on a tie vote, left undisturbed a decision that allowed the lawsuit of Daniel Stephenson, a retired helicopter pilot living in Florida. Both men claim their cancers are related to Agent Orange, used in the 1960s and 1970s to clear dense jungle foliage that provided cover for enemy forces.

This decision allowed the prior lower court decision to stand, which essentially allows Agent Orange injured individuals another opportunity for litigation. Petitioner is engaging in the window of opportunity to bring Petitioner's Agent Orange issues out via litigation.

Another opportunity for litigation recently took place when it was discovered that the Ranch Hand documents were manipulated in order to keep documents showing exposure to Agent Orange outside of Vietnam from making the official record. An example of this manipulation is located in Tab O, Services Herbs Tapes, A Record of Helicopter and Ground Spraying Missions, Aborts, Leaks, and Incidents, Department of the Army. The Service Herbs Tapes state that the prior Herbs tape has no information whatsoever regarding ground vehicles or backpack spraying. This type of spraying was used around the majority of bases to keep vegetation under control which minimized the ability for an enemy attack. Amazingly this type of spraying took place at nearly all the bases, in country and out of country. One recent Board of Veterans Appeals (BVA), case proved this point and allowed Agent Orange coverage for defoliation which took place in Osaka Japan.

The Service Herbs Tapes further indicates deficiencies by stating U.S. Army Chemical

Section records and other documentation contain the data about helicopter, backpack and other types of ground spraying. This record contains primarily Army information, neither Air Force nor Navy; as such this data is still deficient. Again this document, released after the 1984 settlement, containing even more disclosure of Agent Orange spraying, and even this document discloses internally that the information contained is not complete. The lack of completeness of the Service Herbs Tapes also exists in that no disclosure was made of Agent Orange outside of the Country. This redaction of out of Country Agent Orange was intentional and misleading to Veterans and their beneficiaries, and is also discussed later in this document.

Disclosure, in the Service Herbs Tapes, of a vast amount of concealed data came out one year after the 1984 Agent Orange settlement. The data is still being concealed, with only about 60% of the data released, Tab CC. This manipulation of data was discovered by Petitioner in 2005, and Stellman in 2003, Tab CC. The Ranch Hand study, until recently, only focused on spraying of Agent Orange from fixed wing aircraft in Vietnam. The Services Herbs Tapes, Tab O, originally classified, and now only partially available in an unclassified version, still focuses on the spraying in Vietnam, and is similarly restricted to that of the Ranch Hand Study. The spray patterns that went over the Thailand, Laos and Cambodia borders were intentionally redacted. This Ranch Hand study and the Service Tapes were seen as the literal bible for exposure to Agent Orange, despite the intentional redactions of the true Agent Orange spraying patterns. Dr. Michaelk disclosed, in the year 2000, and later in his talks on the Ranch Hand project, that he was made aware of Agent Orange flights in Thailand,

contrary to prior claims of the Ranch Hand study. The failure to even presently disclose spray patterns in Thailand and originating from Thailand has negatively affected Petitioner's attempts to obtain Agent Orange benefits.

Petitioner served in Thailand, Japan, and Midway Island. There are several published cases that exist, through the BVA, allowing for Agent Orange settlements which include the exact same bases Petitioner served on. However, the VA does not see the BVA cases as binding on Petitioner's case. It seems time to discard the Presumptive Test fiction so that the limited staff in the VA can use a new Touch Stone Test. Requiring the Presumptive Test, a fraudulent test, as the basis for Veteran Claims while also denying documentation of Agent Orange Exposure from making the light of day seems criminal. The problem is further compounded when others have traversed the burden of proof threshold and been awarded Agent Orange benefits. In previous settled cases, similar in location and time to Petitioner, with the VA not using as authority previously granted benefits cases to satisfy the burden of proof issue with Petitioner's Agent Orange Exposure benefit requests seems to both be in error and also verging on criminal conduct. The VA seems to be the only entity that Counsel knows of that does not use its own rulings as authority in future cases, which limits the ability to obtain justice for those lucky enough to survive the over 34 years since the Vietnam conflict ended.

The 2006 Hamdan vs. Rumsfeld Supreme Court case 05-184 held that the U.S. base in Guantanamo, Cuba detained individuals should be held to the precepts of the UCMJ, Due Process and the Geneva Convention. The same precepts of the UCMJ, Due Process and the

Geneva Convention required in Hamdan should similarly be applied to the U.S. Government's own military service members when they are Denied Due Process in Agent Orange cases, that are based on the U.S. Government's fraudulent settlement or a previous Agent Orange case.

## 4. SUMMARY OF CASE

Counsel has provided case law to the VA which reflects legal authority that Agent Orange was used in Thailand, where Petitioner served for two years. Agent Orange was also used in Laos and Cambodia, as well as Thailand, Tab AA. However, Respondent has gone through a great deal of trouble concealing these facts from the American population, and in particular Petitioner. Previous documents were submitted to the VA, by Petitioner's Counsel, originally in a tabbed and indexed manner. Those Tabbed documents, listed in the Appendix of this Document, will later be submitted to this court under a Stipulation Request with Respondent, if necessary. These sources range from documents obtained from the CIA, Foreign Countries, the VA, and State Veteran's agencies that were so frustrated by the lack of progress and blocking of progress by the VA that these states did their own analysis. Various States did there own analysis when the VA was claiming it was unable to do a study, or the study the VA did only comprised of 15 individuals. The state of Michigan individually had over 50,000 individuals whom volunteered for study. This study resulted in 75% of those over 50,000 Michigan Veterans sick and with various forms of cancer rate.

Petitioner's set of documents provided to the VA also include the Herbs Tapes, the Ranch Hand transcripts, as well as, subsequent additions known as the Service Herb Tapes, and updates by

Dr. Michaelk, a writer of the Ranch Hand Project, discussing recently that, despite statements to the contrary in the Ranch Hand Project, Agent Orange was conclusively used in Thailand, the Country where Petitioner was stationed. Petitioner also provided the VA with documents showing the Ranch Hand transcripts of 2000, and an abundance of proof that Agent Orange was flown out of Thailand. Despite this, the VA has denied officially any Agent Orange spraying in Thailand, despite a 1974 soil sample taken by NAS, in Pran Bur and Bo Fai Thailand showing Agent Orange exposure. Pran Burui Thailand is estimated to have contained a range of 3 to 50 p.p.m. TCDD, which was consistent with the range observed in the Johnston Island stockpile, Tab CC.

Udorn, Thailand was both an Air Force Base and a CIA base, Tab V, which was also the base of operations for Agent Orange testing in Thailand. The tested Agent Orange in Pran Bururi is likely to have originated from Udorn.

Petitioner worked on some of the CIA Air America aircraft, both in Udorn and Korat, as well as the Air Force planes. The secret nature of Petitioner's work partially challenges the requirement that Petitioner has the burden to prove Agent Orange more likely than not was used. Despite this switch in burden for those who do secret work, the burden as to Petitioner should have been satisfied when case law exists and has been provided showing a worker from the same base, Udorn, being granted Agent Orange exposure. Because of the switch in burden as to Petitioner, combined with case law precedence, granting the same Agent Orange benefit for Petitioner would be both equitable and fair.

The Udorn, Thailand Base, started with Project Water Pump in the early 1960's. The mission was "nothing less than providing the senior US official (SUSO) in Laos a secret air force with which to fight a secret war," Tab BB. A level of untouchability is disclosed in this next statement, "Air America employees will not undergo inspections because of their official status as employees of the United States Government and or the Government of Vietnam", which is contained in Tab X. The secret nature of Udorn, and arguably the possible employment at Udorn by the Country of Vietnam, may have created Udorn with the same characteristics as the Vietnam Consulate. If Udorn was, in fact, a Vietnam Consulate, which operates as a sovereign nation under the rules and regulations of the Country it represents, Petitioner would have also satisfied the Presumptive Test, for working inside Vietnam since Udorn would have been technically inside sovereign Vietnam.

The fact of Agent Orange use in Laos is verified by the CIA itself, via its second in command in Footnote 34 and 35 in Agent Orange in Laos: Documentary Evidence, by Andrew Wells-Dang, Expanded version, August 2002. This is also disclosed again in Jacques Decornoy; "Une compagnie privee americaine participe a la lutte contra la guerilla," Le Monde (Paris), April 20, 1968, p. 2. In an April 1968 interview the Vice-President of Air America declared that his company had been contracted by the Department of Defense to defoliate vegetation in Vietnam, Laos, and Southern Thailand, based from the Udorn Thani airbase, the same base Petitioner worked out of. This is the smoking gun of proof, showing Agent Orange existed at the same base Petitioner worked from, by a ranking member of the CIA in a first person account.

The use of Agent Orange in Laos has been shown in this document to have occurred, and was sanctioned by the U.S. Government, Tab AA. Allegations of the secrecy of Agent Orange operations in Laos and Cambodia were claimed by U.S. Ambassador William Sullivan, not necessarily secret, but he stated: "rather it was not admitted or confirmed." In 1965, the 2002 article cites in Tab AA, Sullivan further used deception, when he discussed Agent Orange drops outside of Vietnam, stating: "we can carry on these efforts only if we do not, repeat do not, talk about them, and when necessary, if we deny that they are taking place." Tab AA. "The Service-Herbs file shows flight paths for 210 missions, which sprayed about 1.8 million liters" in Laos, Tab CC. Although this number of missions is totally "incomplete", the fact that many of the missions originated from Udorn, Thailand again establishes connection between Agent Orange and Petitioner. Note, in 1969, despite the U.S. Claims of not spraying Agent Orange in Cambodia, Ranch Hand transcripts show spraying, and Cambodia claimed 70,930 Hector acres were defoliated, some of which may have originated also from Thailand, Tab CC.

Further proving the fact of Agent Orange's usage outside the boundaries of Vietnam, was the Kimpong Cham incident of Agent Orange drops in Cambodia, where the Secretary of Defense Melvin Laird requested that he personally approve any herbicide operations in "Laos, Cambodia or Thailand." Tab AA. The fact that herbicide operations were not disapproved, only approved with special permission indicates that the herbicide operations continued. The chastisement and demand for future approval similarly proves Agent Orange was used outside the Vietnam borders. Further proof of Agent Orange operations outside the boundaries of Vietnam includes

General William Westmoreland 1966 statement in a telegram "During **all phases, there will be an intensification of psychological warfare and herbicide operations... through the Laotian Panhandle**... We must use all assets at our disposal to block, deny spoil and disrupt this infiltration." Udorn was the main base for Laotian operations, including Agent Orange drops.

General William Westmoreland first proposed crop destruction in Laos in May 1966. In 1966-1969 20,485 acres had been targeted from a single base in Thailand. In 1969 Vang Pao, a leader of Laos, and also known drug lord, had crop destruction missions done at the Plane of Jars in Laos. Also, in 1969 one mission report describes "a highly successful attack on enemy rice crops in North Laos... almost four thousand acres destroyed just before harvest." No weapon other than Agent Orange and its variants were designed for defoliation; as such this statement is an admission of Agent Orange Use. From 1971-1974 Opium was similarly targeted in Laos, most probably Agent Orange and Blue drops by the CIA, out of Udorn Thailand, the same base Petitioner worked from.

If the base that delivered Agent Orange drops in Laos wanted to maintain outside the Geneva Convention jurisdiction because of the secret nature of the war, this would dictate that the base was both outside of Vietnam and under CIA control. The base used was Udorn, Thailand, the base Petitioner served at for two years. This proves, again, Petitioner's Service connection to Agent Orange.

To illustrate, not just conjecture, actual planes were modified for spraying capabilities and

known to operate in Udorn, Thailand. These would have been the same planes that Petitioner worked on or around. Even if not all of these planes were individually serviced by Petitioner, the fact Agent Orange and Blue was stored on site to service these planes, proves that Agent Orange and Blue were present when Petitioner served in Udorn. Evidence exists through the various planes, including their tail numbers. Amazingly, many of these planes were subsequently bought after their service in Udorn, Thailand, by other undercover operations of the US for spraying work in both Saudi Arabia, and Africa. Tail N5454V was "operated by ARPA's Combat Development and Test Center in Thailand as a sprayer aircraft for "aerial application of herbicides" (Minutes of ExCom-AAM of 11 June 63, in UTD/CIA/B3F4), Tab AAA. This plane was known as a Ten Two Sprayer. Note Tab AAA, under II Statistics, 7 Beach 18's were acquired in 1963 and converted to Ten-Two's. 5 were converted in 1964. 12 Ten Two conversions took place in 1966. In 1969, 10 Ten Two's were in operation, in 1969, 2 in 1971, 8 in 1972, 2 in 1973 and 2 in 1974.

Documentation exists that shows the Volpars, also referenced in this same tab, were equipped with aerial spray capabilities, Tab 2. Note the Volpars, were also operated by Air America, Tab 2. Proving the connection between converted Agent Orange aerial spraying Volpars and Udorn, Thailand is Tail Number N9671C, a converted Volpar. This Volpar had 92 classified "MM "missions flew by Frank Bonansinga from Udorn. This plane had been transferred to Nairobi in December 1988 for UN_IITA Africa wide Biological Control Program of Cassava Pests. Tail Number N7695C, was the plane which the Air America President Hugh L. Grundy flew. Given that Air America was based out of Udorn, and some of the flights were flown by Frank

Bonansinga, also based out of Udorn, this plane was likely also based out of Udorn. This plane, as well as many other sprayers, such as N9518Z, N6154U, N9956Z, N3728G, were operated in Thailand and subsequently sold to CIBA- Pilutus Aerial Spraying, Stans, Saudi Arabia, another undercover operation of the US. Many of the sales started after 1975, the supposed end of hostilities with Laos. These sprayer units, operated by Air America primarily out of Thailand, would similarly have been based in Udorn, Thailand.

A Document titled, Air America, 1971, obtained under FOIA from the CIA, release date 2/3/1999, has been obtained Tab X. This document recites control and Inspection of Passengers and Luggage on Air America Case Number f-1998-01601, page 4. This document further shows the passengers on Air America will not undergo inspections because of their official status as employees of the United States Government and/or the Government of Vietnam. If the workers of Air America, including Petitioner when he was pulled from his Air Force duties to Air America duties, were in fact, employees of the Government of Vietnam, while on another country's land, in this case Thailand, it could be inferred that a portion of the Udorn base was, in fact, similar in status to an embassy of Vietnam. This would be yet another way to allow Vietnam service connection to Petitioner.

Tab AAA identifies C-45's used for Fire Practice out of Udorn, also viewable in the documentary Flying Men, Flying Machines. Agent Blue was used for Fire Fighting, as well as to defoliate. As such, not just Agent Orange can be traced to Udorn, but also Agent Blue, which was flown in C-45's.

Petitioner's Counsel's research discovered the CIA used Caribou aircraft for spraying of Agent Orange. Those Caribou were also based out of Udorn, Tab 6. This is also yet another **smoking gun linking Agent Orange to Udorn Thailand while Petitioner was stationed in Thailand.**

Planes were dropping Agent Orange by the CIA, and by CIA trained Laotian Hmong pilots in Laos, Tab BB. Udorn was used to train Laotian's, including Hmong, without technically violating the 1962 Geneva Agreements.

Air America and Air Force planes dropping Agent Orange in and around Vietnam were worked very hard. Due to harsh work loads, the planes were serviced by large ground crews and large bases, including Udorn. Petitioner advises that planes would be flown into Udorn off sequence because they were shot and needed repair, and this base had the ability to repair aircraft. These out of sequence take offs and landings explain, partially, why some of the planes did not have prepared flight plans indicating Udorn, Thailand as the intentional destination. Inside the planes serviced at Udorn often barrels of Agent Orange would be seeping from the gun shots of the damaged planes, while workers, such as Petitioner, worked on the planes attempting to make them air worthy. An example of such a plane is one referenced in this series of documents, known as Patches.

Respondent can also possibly grant Petitioner's Exposure claim by allowing the flights out of Korat, Thailand to be considered actually within Vietnam airspace. Therefore, dispensing with

the legal hurdles Petitioner is faced with to show service connection. Respondent can also trace shipments of Agent Orange through Mid Way Island, Bangkok, Thailand, and Osaka, Japan, and verify that Agent Orange was handled as carelessly in these just cited areas as it was on Johnson Island. This tracing of the Agent Orange Shipments satisfies the old burden Petitioner is actually challenging.

5. STATUTE OF LIMITATIONS HAS NOT EXPIRED

Petitioner discharged from the Military, effective 1983, with an honorable discharge after more than 18 years of service. The 2004 Agent Orange Supreme Court case re-opens the door for litigation; therefore, statute of limitations has not expired. Additionally, since the Government just disclosed that Agent Orange was used in Okinawa, Japan via a BVA case settlement, as well as multiple locations in Thailand, based on BVA case settlements, this further leaves the door open for litigation. Dr. Michaelk's 2000 Ranch Hand update showing Agent Orange was used in Thailand, combined with discovery that the Herbs Tapes and Service Herb Tapes still show that out of Vietnam Agent Orange drops are redacted and classified, i.e. concealed from public view. Because of the past and present failure to adequately disclose accurate Agent Orange missions, presently and in the past, the Statute of Limitations should only start at the time the Government has fully released Agent Orange Data. Since this has not yet fully happened, it seems reasonable to argue the Statute of Limitations has not even started. As such, Petitioner's case is not past the Statute of Limitations. This request is being made within six years of the 2004 Supreme Court case. Accordingly, this case is within the Statute of Limitations.

6. VETERAN'S DISABILITY BENEFITS

Petitioner was serving on Active service, and since Petitioner was disabled in the Line of Duty, Veterans Benefits should be available to Petitioner, 38 U.S.C.S. 101(16); 38 C.F.R. 3.1 (k), 3.303(a) (2005). The United States was on a war footing with Vietnam, as well as engaged in secret wars with Laos, Thailand Guerillas, and Cambodia at the date of Petitioner's injury and later discharge, Petitioner will argue that the injury occurred during a time of War, despite the fact that some of these wars were secret and not disclosed to the public until recently.

Even if the injury is not deemed to have occurred during war time, because of Petitioner's various base locations, the injury happened while Petitioner was performing his military duties and the injury occurred in the Line of Duty. Petitioner's duties and concurrent injury while performing those duties satisfies the In Line Of Duty Requirement of 38.C.F.R. 3.303, 3.304 (2005).

The denial of medical benefits to a service Member violates Title 38, of the U.S.C. As soon as knowledge of Petitioner's injuries from Petitioner's exposure to Agent Orange was known, the VA was advised. Petitioner was denied access to medical treatment based on his Agent Orange exposure. This denial of treatment has caused Petitioner to continue to suffer medical complications through to the present day, such that Petitioner is presently blind, and dying

from the Agent Orange Exposure.

7. SPECIAL COMPENSATION

Under 10 U.S.C. Section 1413(a) Petitioner would qualify for twenty-five (25) years of service if Petitioner were not too sick to stay in the military, as well as, qualify for a disability that is compensable under the laws of the Secretary of Veterans Affairs and while engaged in hazardous service when Petitioner was injured from his exposure to Agent Orange and Agent Blue. As such, Petitioner should be able to request Special Compensation under 10. U.S.C. S. Section 1413(a).

8. MILITARY PAY

This case is being requested under (1) A statutory and regulatory challenge to a service member's separation and (2) A claim for military retirement benefits.

Petitioner's authority to provide relief in this matter is governed by the terms of the Back Pay Act, 5 U.S.C. § 5596 (1976). The Act provides that, on correction of an erroneous personnel action an employee of an executive agency of the federal government is entitled to receive: "an amount equal to all or any part of the pay, allowances, or differentials, that the employee normally would have earned", Polos v. United States, 231 Ct. Cl. 929.

9. ENLISTED PERSONNEL CLAIM

The challenged adverse personnel action was grounded in either a statutory or regulatory violation; therefore, this case satisfies Brigante v. United States, 35 Fed. Cl. 526, 529 (1996).

10. RETIREMENT BENEFITS AND OR SEVERANCE PAY

Petitioner was injured by Agent Orange exposure while on active duty. Petitioner never received a medical release from his doctor prior to discharge. Since Petitioner was injured while on active duty the Court of Federal Claims possess jurisdiction to entertain the Secretary's decision not to appoint Petitioner to a disability list, 10 U.S.C. 1201-21 (1992), Sawyer v. United States, 930 F. 2d 1577.

11. JURISDICTION FOR ADVERSE ACTIONS TAKEN UNDER THE UCMJ

Under Burns v. Wilson, 346 U.S. 137 (1953), since Petitioner has exhausted all of his administrative remedies, and the VA denied Petitioner's case in June 2006, the Court of Federal Claims may entertain collateral attacks for adverse actions taken under the Uniform Code of Military Justice.

12. MISCELLANEOUS STATUTES

The Court of Federal Claims possess jurisdiction to determine the amount, if any, due to or from the United States, by reason of any unsettled account of any officer, agent of, or contractor with the United States, or a guarantor, surety, or personal representative of any such officer, agent, or contractor. 28 U.S.C. 1494, 2511 (1988).

Petitioner was disabled and discharged prior to 20 years of service and this effects Petitioner's ability to qualify for Federal Retirement, prior to age 65, from the Federal Government, whom is a guarantor of Petitioner's benefits for Federal Retirement.

13. CONSTITUTIONAL VIOLATIONS

Petitioner has been denied his Due Process rights under both the Fourteenth and Fifth Amendments, when Petitioner was denied his VA benefits without being provided a proper hearing. Petitioner has also been denied his Constitutional rights, by the unlawful taking of Petitioner's property including, but not limited to, early retirement, disability benefits for the injuries Petitioner suffered while on duty, as well as, the lost income Petitioner would have received if he had not been discharged prior to the completion of 20 years of service.

14. CONSENT FOR SUIT

In *Murphy* v. *United States*, 45 F.3d 520, 522 (1st Cir. 1995), the United States consented, in the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*., to be sued for damages for personal injury caused by "the negligent or wrongful act or omission" of a federal employee "while acting within the scope of his employment," and provided that in the same circumstances a private employer would be liable for the acts of his employee under the local law, 28 U.S.C. §§ 1346(b), 2674, 2675(a). No explicit exception bars claims by or against military personnel. Given that the Supreme Court, in 2004, in its 4-4 decision, DOW CHEMICAL COMPANY, et al., PETITIONERS v. DANIEL RAYMOND STEPHENSON et al. re-opened the door for suits against manufacturers of Agent Orange, under Murphy, doors also open up suits against the Federal Government in Agent Orange claims.

15. BACKGROUND OF EVENTS

On, or about, 2005, a Request for V.A. Benefits letter was sent to the VA. Eventually, Petitioner's Counsel's office received a response stating that minimal weight was given to Petitioner's submitted documents VA benefits were being denied to Petitioner. This denial came despite Case Law showing similar granted exposure incidents by the BVA. This denial amazingly came after newly released documents showing the Ranch Hand Study, and the original Class Action settlement, were all based on fraudulent documents.

16. WITHOUT GOOD CAUSE

SMSGT Janaskie was not made privy to essential documentation and real evidence to understand why his Agent Orange claims were being denied.

17. VIOLATIONS WHICH TOOK PLACE WHILE ON ACTIVE DUTY

The "sham" non-judicial/administrative proceeding by the VA in this case denied Petitioner, SMSGT Janaskie, military Due Process recourses of action.

This "sham" non-judicial/administrative proceeding isolated itself from regulation, military and procedural laws, that are part and parcel of serving in the Military. SMSGT Janaskie was in various parts of Midway Island, Osaka, Japan, Bangkok, Thailand, and Udorn, Thailand, all areas that have demonstratable histories of Agent Orange use.

SMSGT Janaskie's "sham" non-judicial/Administrative hearing violated multiple military

regulations, at the same time, violating the spirit of the UCMJ, which is engrained and indoctrinated in every soldier.

18. STATEMENT IN SUPPORT OF CLAIM

Petitioner has Type II Diabetes and is legally blind. Petitioner is also suffering from Myelodysplastic syndrome. Both of these diseases and their respective effects are related to Agent Orange. In Petitioners denial by the VA on his Agent Orange claim, the VA amazingly enough claimed that Type II Diabetes is not on the list of Agent Orange related diseases. Either this was an amazing lack of knowledge by the preparer of the document, or an intentional act to deny a Veteran an actual claim. On November 9, 2000 Diabetes Mellitus was added as a presumptive condition for In-Country Vietnam Veterans, see Tab "Z."

Petitioner's VA denial could also be a function of hiring and attrition in the Local VA office in Los Angeles. Counsel has been advised that no significant hiring has been done in five years and the cases are backlogged years with the Los Angeles VA. Again, the denial of Petitioner's VA benefits could be an error so egregious as to be criminal, or the error could be based on the simple fact that staffing precludes a VA examiner from actually reading what constitutes Agent Orange, and what diseases and symptoms are related to Agent Orange Exposure.

19. MEDICAL DOCUMENTATION

Medical documentation exists showing the complications Petitioner has, as well as the claim by Petitioner's Doctor of Agent Orange being the culprit of Petitioner's diseases.

20. <u>MIDWAY ISLAND EXPOSURE</u>

Petitioner served in the Air Force in several different locations. One of these locations was Midway Island. Midway Island had tests done on its plants and animals. The animals, more than 34 years after the claimed end of Agent Orange's official use, register a high concentration of Agent Orange, Tab 17. The Midway Island service occurred during the period of time that Agent Orange was officially used in Operation Ranch Hand, as explained below, 1970-1971. Midway Island, during the Vietnam and Laos conflicts, was used as a refueling and transfer site for all types of cargo. Because of the range of military aircraft flown in and out of Midway Island, as well as the infrastructure at the time of the Vietnam conflict, it defies logic and military logistical procedure, to have a majority of imported goods go through Midway Island during the Vietnam and Laos conflicts without imported barrels of Agent Orange and some of its the dioxin laced variants. Barrels of Agent Orange are still toxic after being rinsed three times, Tab CC.

The results of the Midway Island Dioxin Research determined that the albatross colonies had been exposed to dioxin. Petitioner worked at Midway Island with shipments of dead bodies that were coming out of the Vietnam Theater, as well as performing his Avionics Job. Petitioner advised that one of the biggest problems in dealing with the cadavers was the rat infestation which existed. The rats were eating the dead bodies, and those rats had to be exterminated with what ever chemical agent was at hand. Petitioner believes that both DDT and Agent Orange were used to kill these rats.

The use of Midway Island in the 1970's is likely the same as Johnson Island is today, Tab 18. Incineration of unused materials and contamination of Agent Orange are still seen today. This same document, tab 18, references a beach with Agent Orange contamination and references that, despite the beach being contaminated in the 1970's and 1980's, the contamination level is still toxic today.

Planes on the way out of Midway Island to the Vietnam Theater were filled with food stuffs as well as Agent Orange and other dioxins. This service factor, on its own, satisfies Petitioners threshold level of being exposed to Agent Orange while in the theater, as well as establishing that Dioxin has a life span that is considerably longer than a few years. Recall that in Vietnam pre war studies on Prisoners in Pennsylvania revealed that a pin drop of Dioxin, the same material contained in Agent Orange, was found to be deadly within 6 months in 80% of the cases.

21 KORAT AIRSPACE CROSSES INTO VIETNAM

Petitioner flew into various bases to repair avionics when needed. He worked for the Air Force and was called up to work on CIA Air America and Air Force Planes. This work took him to such bases as Thailand Bangkok, as well as Korat. The importance of flying in and out of Korat, Thailand is that the Vietnam airspace is only half a mile outside of Korat. Flying a small plane and being off 5 miles at night would not be unusual. Therefore, being off half a mile from the airport and crossing Vietnam airspace is rather likely.

Petitioner worked in Korat on occasion, and its proximity to Vietnam with the likelihood of

bleeding into Vietnam's airspace provides Petitioner with a claim of actual "In Country" Vietnam service. If this is agreed, the case need go no further and the Agent Orange issue is presumed.

22. PRIOR CASE LAW SETTING THE PRECEDENT FOR AGENT ORANGE USE IN THAILAND

In Docket 02-04 965a, Tab 20, this Veteran submitted a sworn statement showing Agent Orange was used in Thailand. The U.S. submitted a statement showing Agent Orange was in fact stored in Korat, and that some of the barrels leaked, forming a tar pit. These same chemicals were disposed of via burning, causing dioxin vapor to be released in the air. Petitioner flew into Korat, and it was known that Agent Orange was stored in Thailand. This fact satisfies a connection for Petitioner, again, proving to be in the same locality known to contain Agent Orange. Given the size of the runway at Udorn, major supplies were shipped into Udorn and then sent out to bases such as Korat. Given that Korat is on the shipment route, it is likely that Agent Orange was not only housed at Udorn, but also transferred to Korat by way of Udorn.

In Docket 98-06 178, Tab 21, an individual whom was diagnosed in 1996 was granted Agent Orange coverage. Petitioners issue relates to both his tumor and his diabetes Type II, with the later discovered and diagnosed while Petitioner was still active duty with the military. If an individual, such as in this referenced case, can be re-diagnosis over 20 years from the date of service, then Petitioner, whom was diagnosed with his issues prior to his discharge date, should

similarly be granted coverage.

In Docket 99-08 894, Tab 22, a malignant lymphoma was the issue. Here Petitioner has a similar claim. In the above issue a maintenance worker employed to work on B-57's in Thailand was awarded coverage. Petitioner was in Thailand, working on every type of aircraft, including B-57's, C 123's, K 123's, 119's, F-4's, Volpars, Ten-Two sprayers, B-45's and AC 10's, F-4 Phantoms, etc. In this case the individual was working in Ubon, which is just an alternative name for Udorn. This case provides that both a similar type of worker, working in the same place was granted Agent Orange Exposure. This exposure has already created precedence. Following this precedence, Petitioner requests the same benefits for his Agent Orange related issues.

In Docket 95-06 571, Tab 23, an AC 130 gun ship gunner, based out of Thailand, was awarded Agent Orange benefits. If a gunner of this AC 130 can be awarded Agent Orange exposure, then those who worked on the machinery of the plane should be awarded benefits. The logic pattern should follow that the dioxin from Agent Orange contained in a plane flying over Thailand, Cambodia and Vietnam is not instantly de-toxified from the Agent Orange residue it has just dropped when it crosses the Thailand border and lands. Studies encapsulated in this document, show that Agent Orange actually has a life span of a toxic nature extending from the 1970's to the present.

As such, this last case goes toward proof that a machine operating in Vietnam and Thailand can

cause an operator and a worker of that machine, when the machine is serviced on the ground, to suffer from Agent Orange related issues.

In Docket 96-31 706A, Tab 24, another Veteran, operating in Thailand, provided credible evidence that Agent Orange exposure existed while that Veteran was in Thailand. This case also shows that Agent Orange benefits have been granted to others working in Thailand. Credible evidence showing use of Agent Orange in Thailand has, again, been proven previously by another soldier. This proof, combined with the intentional subversion of the Military and the CIA to disclose Agent Orange records, even at the present, should minimize the need for an individual to track each and every barrel of Agent Orange against a government that has attempted to thwart its accountability at every turn, by issuing false and inaccurate statements regarding Agent Orange Exposure.

23. PETITIONER WORKED ON THE CIA AIRCRAFT

Udorn, Thailand was the headquarters of the CIA operation in the Vietnam Theater. This is the same base where Petitioner worked on both the Avionics for the CIA, and the Air Force. In discussing this matter with the Senate Oversight Committee, Petitioner's Counsel was advised that when an individual of the service is working in conjunction with the CIA, the burden of proof is substantially lowered for a Veterans Claim. As such, given that Petitioner has two issues, one being a soft tissue tumor and the second being type II Diabetes, both of which are covered under the Presumptive Test, due to the nature of the CIA work assignments, Petitioners claim should be granted.

24. AGENT ORANGE USE IN LAOS

The United States was involved in a secret war with Laos, which was not publicly sanctioned, and therefore had to be fought with mercenaries, local villagers, and CIA assistance. This secret war resulted in the U.S. dropping bombs and Agent Orange on the "Ho Chi Minh Trail", located in Laos. (Tab 1) Agent Orange in Laos and Cambodia: Documentary Evidence. Given that Udorn, Thailand was the largest CIA operation in theater, much of the plane traffic for this covert war in Laos originated from this base, which again was the same base Petitioner was stationed at for a period of time. On page 13 of the above referenced document an official of the U.S. stated: "were going to turn the Ho Chi Minh Trail Brown." If anyone has ever seen documentation of Agent Orange exposure, the turning of a previous forest brown is exactly the effect of Agent Orange. Agent Orange kills trees hundreds of years old within weeks, thereby turning a forest, such as Laos, brown. Tab 3, page 254 indicates that the 1st ACS "Hobos" were used to drop gravel bombs on the Ho Chi Minh Trail. Note these bombs would only be effective when the area was cleared of plants, via defoliation. Therefore, the use of gravel bombs, flown out of Udorn, was likely a second stage used after Agent Orange had been previously dropped on the same target area. Under Article 3 of the Geneva Convention, every attempt was made to have the secret Laos war fought from a country other than Vietnam. This action then, as previously stated, takes the war footing into Thailand, which has been admitted by Respondent in various cited articles. This war footing would have been primarily based in Udorn, thereby making the connection again between Udorn and Agent Orange, which makes it more likely than not that Agent Orange was dispersed for these same trails by way of Udorn.

On page 14 of this same document, Thailand based spraying capabilities were actually discussed in 1964 and 1965. With documentation presented both previously and later in this paper, Counsel shows that, not only was it discussed, spraying out of Thailand actually took place. Tab 3, page 184 indicates use of the Udorn base for Ho Chi Minh Trail in Laos. The targeting officially changed in the 1970's to the Khmer Rouge in Laos and Cambodia, Tab 3, page 188. Counsell's research also contains German sources, Tab 7, discussing the communist group Pathet Lao and describing an Agent Orange connection with the United States as late as 1973 with the Pathet Lao. Other documentation I have come across indicates the U.S. was involved in drug trafficking and drug interdiction, via Agent Orange spraying against Vang Pao's Opium competitors in Laos, up until 1975, and possibly even the mid 1980's.

Tab 13, page 1 argues that many innocent Hmong were killed by chemical warfare. One of the chemicals used was referred to as Agent Orange; however it might have easily been Agent Blue. Amazingly, one assertion is that Communists were the ones dropping this "Yellow Rain", also known as Agent Orange, when in fact the recovered bombs had American markings, and the CIA was known to have the chemicals and the planes to create such warfare. Under Department of the Army, BZ Psychochemical War Agents, June 1973, this document further cites the use of toxic agents with temporary disabling effects. This document cites a report Natural Sciences, Neilands J. B1: 60:183, 1973. Based on this document, the US was known to use both toxic agents and defoliants in the Vietnam era, again proving Petitioner's argument.

No report exists showing that the Pathet Lao had their own planes. When no delivery mechanism exists for the Pathet Lao to drop Agent Orange, i.e. planes, and discovery reflects that the bombs dropped were of U.S. Manufacturer. The argument that Agent Orange was dropped by anyone other than the US, or one of our unnamed covert agencies, is such a stretch of logic as to reach into the realm of the absurd. No such report exists, showing Dow Chemical sold Agent Orange, to the Communist party. Dow and the other manufactures claim Agent Orange, and its variants, were sold only under duress, and only to the U.S. Military. No plant has yet been discovered where American made bombs were disassembled, and then reassembled with Agent Orange by other than U.S. forces.

Based on the fact that the Laotian Hmong people themselves state they faced "Yellow Rain", a.k.a. Agent Orange, combined with facts that the CIA had Agent Orange, the CIA was based out of Udorn, and the bombs were of U.S. Manufacture, it seems likely that the CIA was directly involved in the Agent Orange drops that some Laotian Hmong claim took place. This statement by the Hmong also tends to verify that Agent Orange came from the U.S. and, more likely than not, out of Udorn.

There was no cease fire in Laos until 1975, two years after the 1973 agreement with Vietnam, Tab 14, page 5. As such, the CIA likely continued to operate in Laos until the end came, via the 1975 surrender. This time frame also establishes that operations were still ongoing in Laos, well after the Vietnam conflict. Given that the United States did not want to loose the war, Tab 14. Page 4, indicates, again, that more bombs were dropped in Laos than the U.S. dropped on

Germany and Japan in World War II. It is likely that the U.S. continued to use every means possible, including Agent Orange to accomplish our objective, just as was stated by General Westmoreland. Recall in General William Westmoreland in 1966 stated in a telegram "During **all phases, there will be an intensification of psychological warfare and herbicide operations... through the Laotian Panhandle**... We must use all assets at our disposal to block, deny, spoil, and disrupt this infiltration," Tab BB.

The fact of Agent Orange use in Laos is verified by the CIA itself, via its second in command in footnote 34 and 35 in Agent Orange in Laos: Documentary Evidence by Andrew Wells-Dang Expanded version, August 2002 Jacques Decornoy; Une Compagnie Privee Americaine Participe A La Lutte Contra La Guerilla, Le Monde (Paris), April 20, 1968, page 2. In this interview the Vice-President of Air America declared that his company had been contracted by the Department of Defense to defoliate vegetation in Vietnam, Laos, and Southern Thailand, based from the Udorn Thani airbase, the same base Petitioner worked from. This is the smoking gun of proof showing Agent Orange existed at the same base Petitioner worked from, by a ranking member of the CIA in a first person account.

The verification of Agent Orange use in Laos also comes from foot note 35, Robert Kaylor, Despite Critics, Defoliation Continues in Vietnam, Los Angeles Times, January 4, 1970, page. E10. Additional proof of Agent Orange use comes from foot note, the 1971-3 opium destruction missions were probably carried out on this basis, and secondary sources also report that the CIA had spray mission capabilities.

25. CIA'S DRUG TRAFFIC RELATIONSHIP

It is well known, and more so documented after the Iran Contra Scandal, that our government does operate war in unconventional methods and with unsavory characters, Tab 15. It is neither the time nor the place to argue the effectiveness of this tactic. Essentially the CIA in its effort to control the Golden Triangle, associated with individuals whom were beneficial to the United States. The United States essentially took off where the French had previously been, Tab 4. The CIA chose the Hmong to work with. The Hmong were both tribal and operated two major agricultural crops, rice and Opium.

The Hmong people were fierce fighters and swayed toward United States goals. The downside of this was that the United States had to supplement food and Opium cash crops to allow the Hmong to fight. The CIA out of Udorn were intent on training the Hmong people as fighters and pilots that there are stories at Udorn about how difficult it was to teach the Hmong, an illiterate people, how to fly an airplane, Tab 3, page 179, 182. Along with teaching several Hmong how to fly, the CIA based out of Udorn conducted operations that benefited the Hmong, Tab 11, Page 3. The operations consisted of providing food staples the Hmong needed, as well as providing transportation for Opium out of the Jungle, Tab 5, page 2. Also see ( Tab 10, page 1.)

The leader of the Hmong people, during the Vietnam and Laos conflicts, was General Vang Pao, Tab 4, page 2. General Vang Pao went from a relatively small tribal leader and drug lord to a major leader and drug exporter from Laos. It is also well documented that a much larger

percentage of the population of Vietnam Veterans had substance abuse issues, when compared to the general population of the United States.

It was also well documented that the U.S. DEA agents, despite being situated in the Golden Triangle, which is a major origination for Opium, did not make a single large arrest. In an Article an Interview with Alfred McCoy, November 1991, McCoy advised he had testimony from Mike Levine of the DEA, whom operated in Thailand in 1971, the same time Petitioner worked in Thailand. Mike Levine, found out who was delivering heroin, and requested approval for making an arrest. He was pulled off of the case, since the CIA were assets of the Drug trade. Only an agent from Switzerland, working in the area, made a large Opium arrest, and was then retaliated against by being transferred out of the area. The actions of the U.S. Government, i.e. protection from arrest and the ability to transfer out the only agent who had made the sole arrest in the Golden Triangle, gives further credence to arguments made throughout this document which allege the U.S. Government actively involved in smuggling Opium through the Golden Triangle, which includes Thailand. The relevance of this to Petitioner's case is that, in protecting and distributing Opium, the U.S. was protecting its drug fiefdoms via individuals such as Vang Pao, who requested, and was granted, Agent Orange/Blue drops on rival Opium growers who didn't fall under the protection afforded U.S. destined and U.S. controlled Opium.

The strength of General Vang Pao, his level of control of the flights in and out of Laos, combined with protection from prosecution, as well as a growing market of Opium flooding into the ranks of the U.S. military, has much more than the appearance of U.S. involvement with

the Opium trade. During this same period of time, in an Article an Interview with Alfred McCoy, November 1991, he states 1/3 of the U.S. combat troops were Heroin addicts. These actions and inactions tie our hands to those Opium growers, during the Vietnam and Laotian conflicts. The transportation of Opium out of Laos is an issue discovered in classified military documents.

During this war, the purity of Heroin was amazingly high. An indication that the drug ran through a small number of hands, since purity of street drugs tends to be a function of the number of individuals or businesses involved, and the level of government protection afforded the smuggler. Another fact which gives credence to the direct involvement of U.S. involvement in drug smuggling was that of a U.S. Company, having a Soft Drink bottling plant in Laos which, reportedly, never produced a single soft drink out of that plant. This plant is said to be used as a production facility for Heroin, thereby providing the pure heroin which was making its way into the military, as well as the streets in the United States. Another point regarding the U.S. involvement to drug trafficking was that the Golden Triangle went from no real export of Heroin to a major exporter of Heroin during the Vietnam and Laotian Conflicts.

These facts indicate the United States was just as involved in the Laotian drug trade during Vietnam as was disclosed in Iran-Contra affair. The physical site of drug production known as the Soft Drink plant was also known as Alternate 20, Tab 4, page 2. This is relevant to Petitioner's case because to benefit the Hmong and injure the rival, non friendly Pathet Lao, the CIA was bombing areas, such as the Plane of Jars in Laos, with bombs containing Agent Orange. The CIA controlled Air America dropped Agent Orange on the Hmong's rival Opium and rice

crops, Tab 1, page 14. This activity, done in Laos, was by a disavowed, but controlled, group of the United States CIA, known as Air America; the same group that had its headquarters in Udorn, Thailand. Tab 8, page 2 indicates that the CIA war in Laos was financed largely by Heroin Trade, which again shows a need of shutting down rival growers of Opium via Agent Orange spraying necessary to fund the war. These same points of CIA involvement in the Drug trade of Opium is covered in Tab 9, page 1. An Article an Interview with Alfred McCoy, November 1991 stated Marice Belleux, the former head of the French equivalent of the CIA, SDECE advised that the French had financed all their covert operations from the control of the Indochina drug trade. Marice advised that the French would fly opium down to Saigon, and also the French assets would distribute the heroin. Marice further advised that the CIA had taken over the French assets and were pursuing the same policy.

## 26. AIRCRAFT INVOLVED IN AGENT ORANGE OUT OF UDORN

One way aircraft was diverted for Agent Orange work outside Vietnam, into Laos and Thailand, is contained in a memo from Colonel Downey, asking for Ranch Hand planes for mosquito control, see Tab 25. Mosquito control was a euphemism for covert Agent Orange drops. Other Agent Orange spraying occurred via Beech 18 aircraft, disguised as private agricultural planes, see Tab 26. This information was uncovered by Representative Lane Evans. The tail number of the aircraft was N5454V, which was listed as a sprayer aircraft for "aerial application of herbicide" in the Minutes ExCom-AAM of 11 June 63, previously discussed in this Petition. Other documentation exists that shows the Volpar airplanes, were equipped with aerial spray capabilities, Tab 2. Note these Volpars were also operated by Air America. An example of this

would be N77770B, known to have flown out of Udorn. Other documentation exists to show that disguised helicopters existed as early as 1969 in Thailand. Tail number N77770B is yet another **smoking gun** linking Agent Orange use to Udorn Thailand, the same base Petitioner worked out of, Udorn Thailand.

Counsel's research discovered the CIA used Caribou aircraft for spraying of Agent Orange. Those Caribou were also based out of Udorn, Tab 6. The Caribou planes used to spray Agent Orange is another **smoking gun.**

27. RANCH HAND TAPES SHOW SPRAYING OUT OF THAILAND, ADMITTED IN 2000 BY DR. MICHALEK

Dr. Michaelk, in a document titled Ranch Hand Transcripts, dated 2000, stated: "[t]here was some spraying, we just found out recently, in Thailand", Tab 28. This same doctor provided a slide of the proof, which should be enough documentation to challenge past VA rulings for the most part, denying any spraying of Agent Orange ever took place out of Thailand. This VA assertion of No spraying in Thailand, has now been proven to be false, which is another **smoking gun** in Petitioner's case.

Tab 6, page 3, lists where A-Detachments, used for Agent Orange, were located; one of these locations was Udorn, and others were Hua Hin, Plane tail N5454 and Nakhon Phanom. All are sites of Ranch Hand activity in Thailand. Proving the point above of Agent Orange activity in Thailand, referenced by Dr. Michalek's statement about Agent Orange spraying for Ranch Hand

out of Thailand, an email from an Udorn based individual claims Udorn's phone book had a Ranch Hand listing at the Udorn base. The use of herbicides in Thailand, is referenced in Tab 12, Postmodern War: The New Politics of Conflict, a book by Chris Gray, and also Tab CC which showed soil samples in Thailand displaying dioxins of Agent Orange at the toxic level.

28. RANCH HAND EXPOSURE-

The original Ranch Hand documents, despite being redacted and subject to blatant cover-up, still provide a starting point to examine Petitioner's case. This is further proven by the admitted Service Herb Tapes, which are similarly redacted. Petitioner was exposed to Agent Orange or other dioxins used in "Operation Ranch Hand", or other dioxin spraying between November 21, 1971 and November 20, 1972. As documented in the Ranch Hand Transcripts, Tab "O", various dioxins were called different colors, (orange, super orange, white, blue, purple, pink, or green), due to the stripes on the barrels of the products. The "Herbs Tape" shows that aerial spraying of Agent Orange by fixed wing through the classified "Operation Ranch Hand" project ended in 1970, with 85 missions and 27,805 gallons sprayed. Agent White ended in 1970 with 77 missions and 10,665 gallons sprayed. Agent Blue spraying ended in 1971, with 12 missions and 11,063 sprayed. However, the project report continues with documentation that 2,400 gallons of an unknown herbicide was used in 8 additional missions in 1971. The report states that including the unknown gallons cited, and additional U.S. Army helicopter missions with the original Air Force Ranch Hand missions, the total "still cannot be absolutely verified through backup documentation." The report goes on stating: "the tape has no information whatsoever on

defoliation accomplished by ground vehicles or backpack spraying by Army personnel, which took place around the perimeters of base camps, fire bases, air bases and other fixed military camps. Heavy cover areas along major highways were also defoliated to prevent enemy ambushes of convoys." The disclosure of other non fixed wing aircraft inside Vietnam was not disclosed until after 1984, with the Service Herbs tapes, Tab O. , Services Herbs Tapes, A Record of Helicopter and Ground Spraying Missions, Aborts, Leaks, and Incidents, Department of the Army 1985 (Redacted). This disclosure is still redacted to inside Vietnam, and therefore, still inaccurate. This new document, however shows a deliberate attempt to conceal until after the 1984 settlement all known discharges and spraying of Agent Orange in Country.

Note, that only after the 1984 illegal settlement agreement, the Service Herbs Tape became available, showing some non fixed wing aircraft, but still redacted out of Country Agent Orange drops ,Tab O Services Herbs Tapes, A Record of Helicopter and Ground Spraying Missions, Aborts, Leaks, and Incidents, Department of the Army 1985 (Redacted). Further information shows that DOD considered exposure to be a low-level health hazard and troops often moved into sprayed areas one day after the spraying. C123 aircraft, flying as many as 39 sorties per day, with as many as 19 aircraft in a group, could occur. Analysis of TCDD concentration in stocks of Agent Orange remaining after the war ranged from less than 0.05 ppm (parts per million) to almost 50 ppm. Domestic use of 2-4-5-T, during the same time, required that levels be less than 0.05 ppm. Therefore Agent Orange, depending on which stocks were used, could have been up to 1,000 times higher in concentration than the level of dioxin found in herbicides domestically available at the time, Tab "S."

29. TOXIC NATURE OF AGENT ORANGE

Agent Orange was deemed to be toxic at 100 times less concentration than was used. This is proven by studies, such as deaths of the Philadelphia prison experiment prior to the start of the war, and compounded by the amount deemed acceptable for domestic use. Agent Orange sites, such as Midway and Johnson Islands, that even today have toxic levels of Agent Orange dioxin based on the exposure faced in the Vietnam era. The use of Midway Island in the 70's is likely the same as Johnson Island is today, Tab 18. Incineration of unused materials and contamination of Agent Orange are still seen today.

The fact that a plane may have been supplied with Agent Orange at Udorn on a refill flight, or for repairs, would, by the concentration level now known to be toxic, would have been toxic to those personnel working on the planes. The fact that some of the spraying was done in Laos, Thailand or Vietnam would be immaterial to those workers. The only relevant item would be the toxic nature of Agent Orange.

30. SOME OF THE ACTIONS DONE OUT OF UDORN

A portion of the time Petitioner spent in the combat area was spent at Udorn RTAFB, Thailand. Here he was assigned to avionics repair of C123 and C130, and various other aircraft previously listed. Udorn is a large base with a hospital, see Tab "Q." Udorn was in the middle of supporting operation "Barrel Roll," see Tab "A." Udorn was supporting FAC RAVENS, (Forward Air Control) with F-4's, 0-I's, T-28's, and U-17's, Volpars, Ten-Two, Helos, Beech and Caribou aircraft. Udorn was also responsible for SAP (Search and Rescue), operating location Bravo,

which consisted all of Thailand, all of Laos West of I 0600E, and all of North Vietnam West o five miles inland and south to 1SOON, see Tab "R".

Under Tab 29, the Monthly report from Udorn, on Air America, obtained from the CIA, C-47's, 6 Choppers, T-28's, o-1A/D, U-1A, etc.

31. AIR AMERICA

The Udorn base was also home of the largest airline in the world, (see Tabs "W") most frequently called "Air America," a cover for the CIA's classified operation in Laos. There were at least 300 pilots and crew flying from Thailand into Laos. The cargo that Air America carried was never checked by anyone, see Tab Z. Some of these aircraft were C l23, C 130, Beech, Volpar, Ten two, and Caribou. Air America picked up, or delivered, men and material from all over the area of combat, including both South and North Vietnam. The activities included Agent Orange drops on the Ho Chi Minh trails, and Opium crops of the non favored drug dealers. The Royal Thailand Air Force was also being trained at Udorn, with some of their aircraft flying into Laos to support their troops. Tab T argues that there is a Presumptive Exposure clause for Veterans that "service in the Republic of Vietnam" includes service in other locations, if the conditions of service involved duty or visitation in the Republic of Vietnam. The fact that Air America personnel were deemed to be either employed by the U.S. or the Government of Vietnam should satisfy that presumption.

32 MORTALITY PATTERNS RELATED TO AGENT ORANGE

Many States have published studies showing mortality patterns greater in comparison to non-veterans, such as Wisconsin, Tab "C." West Virginia did a study that showed soft tissue tumors occurred, see Tab "G." Iowa attempted to do a survey of Vietnam Veterans to survey their health, however, only obtained a 24% response, see Tab "L." The Michigan Agent Orange Commission Subcommittee for Physician's Information, in June 1991, prepared a handbook of information for physicians for the care of Vietnam veterans exposed to Agent Orange and other chemicals, see Tab "U." This same Tab has the statement of Admiral Zumwalt, who before the U.S. House of Representatives on June 26, 1990, spoke of the danger of Agent Orange and the flawed scientific studies and manipulated conclusions that are denying justice to Vietnam Veterans suffering from exposure to Agent Orange, Tab "F" provides a bibliography by George L. Claxton of Agent Orange articles and publications, with accompanying notes. Dr. Arthur Gaiston lectured at the AOVI National Convention at Stanford, Ct, on October 23, 1982, where he gave a history of the fight to stop Agent Orange from being used, and studies that showed the extreme danger, ultimately resulting in Agent Orange being discontinued Tab "H." David F. Caner presented another possible danger of Agent Orange with his talk on "Autoimmune Dysfunction in Vietnam Veterans: There may be a Diagnosis," see Tab "I." On April 21, 1987 the Second Circuit Court of Appeals upheld the settlement for plaintiffs, "in light of both the pervasive difficulties faced by plaintiffs in establishing liability and our conviction that the military contractor defense absolved the chemical companies of any liability", and awarded $180 million in an Agent Orange class action suit, see Tab "F."

Tabs "D," (1991), "P," (1990), "J," (1984), and "M" (1983 baseline) are all different years of the

Air Force health study of exposure to herbicides summaries, which only recently (after the 1984 Agent Orange class action settlement) have begun to show a strong positive association between glucose intolerance and dioxin. On December 11, 1991, during hearings before the House of Representatives, Dr. Broder of the National Cancer Institute told the subcommittee that the more one is exposed to pesticides, for example, 2-4-d, the more likely a lymphoma, (cancer) is to occur. Tab "K" is a series of letters, reports, court documents, and other documentation detailing the danger of dioxin 2, 3, 7, 8-TCDD (the same dioxin in Agent Orange). The transcript of the Advisory Committee on Health-Related Effects of Herbicides, Veterans Administration, dated June 11, 1979, page 44, line 16, provides a statement by committee member **Dr. James R. Allen; " We have found that a relatively low level of exposure to the dioxins, namely, TCDD, is extremely toxic. In some of our initial studies we found that levels, when consumed at 500 parts per trillion in the diet for a period of nine months, produced mortality in over 50 percent of the experimental animals" (primates).** On November 9, 2000 Diabetes Mellitus was added as a presumptive condition for In-Country Vietnam Veterans, see Tab "Z."

33. CONCLUSION AS TO MORTALITY PATTERNS

All of the studies done seem to indicate there was, in fact, a statistically similar mortality record with those that served in Vietnam, as with those that served in areas such as Laos, Thailand, and Cambodia. An argument was made by the U.S. Government early in Agent Orange cases that this relationship, or lack of one that was statistically different, proved no ill effects of Agent Orange when In Country Vietnam vets were compared to those in Laos, Thailand and Cambodia.

This implies that one can lie to the uninformed with statistics. Rather than proving no relation existed, the U.S. Government proved that the Presumptive Exposure was really only a figurative line drawn on a map by members of the legislature. This line has no basis in fact or logic. When the health statistics are shown, as provided by various States, there is a significant difference between those that served stateside and those that served in Laos, Thailand, Cambodia, and Vietnam, with there being a diminimmus distinction between those serving In Country and those serving the surrounding area, i.e. Laos, Cambodia and Thailand.

This type of proof, done multiple times, shows the Presumptive Test is actually a figurative line in the sand that is only used to deny claims for those who are actually injured. This proof also shows that the Presumptive Test is a fallacy, and has no real basis in fact. The fallacy is further proven when, as stated in Tab O A Vietnam Chemical Exposure Index: The Crucial Starting Point for an Honest Study, by 1990 Gregg Knowlton. According to Knowlton the tests for Agent Orange were stopped multiple times. There were only fifteen individuals actually tested for Agent Orange based on the sampling, with a claim of an inability to locate candidates. This is when Michigan did their own test which had over Fifty two thousand individuals test. This Michigan test resulted in over 75% of those tested individuals as testing positive for some form of cancer or disease.

Counsel finds the burden put on soldiers extreme when the mortality patterns provided by multiple states prove that Agent Orange affected all of those in theater, and not the few that slid into Vietnam. Petitioner was working for the Air Force in a combat area during a time when he was actively engaged in service for the benefit of the Republic of Vietnam and exposed to

various harmful dioxins in the process of that service, entitling him to claim his exposure. This theory is compounded when the VA and Congress subverted testing and the States had to take testing up on their own. The Michigan Testing showing a 75% positive rate for Cancer and Disease is actually just slightly lower than the Philadelphia Prison studies of 80%. In view of these facts, Petitioner's Counsel suggests the burden Petitioner and others like him must undergo to prove their injury must be changed to reflect hard science, and not an administrative bureaucracy designed to deny ones claim until that individual is long deceased.

33 TOXIC NATURE

The facts indicate, (Tab 16, page 3), that exposure of toxins, such as Agent Orange, may exist in second generation studies as long as 20 years away from the date of the initial exposure. Given the above mortality charts, and the fact it may take more than 20 years from the date of initial exposure to do a second generation test, it seems apparent that Agent Orange affected the vast majority of those serving in the Vietnam Theater. To determine how bad the exposure is, it may be prudent to do a second generation series of tests, or possibly a third generation series of tests. Counsel estimates that this will never be done by the VA. Since the VA itself was behind the efforts to quash the Agent Orange relationship to various aliments.

34 UDORN BASE

Tab 3 shows that in 1964 McNamera approved the deployment of a Special Air Warfare Center from Hulbert Field, Florida to Udorn Royal Thai Air Force Base. Operation "Water Pump" was

for the direct purpose of providing the U.S. with a secret capability in Laos. Tab 19 shows some of the uses of Udorn, providing the U.S. with the secret capability in Laos, was one of the primary focuses.

35 CONCLUSION

Counsel has shown case law providing legal authority that Agent Orange was used in Thailand. This document also shows, in the Ranch Hand transcripts of 2000, proof that Agent Orange was flown out of Thailand. The fact that Udorn was a CIA base, and that Petitioner worked on some of the aircraft, both in Udorn and Korat, challenges the requirement that Petitioner has the burden to prove Agent Orange, more likely than not, was used. case law shows a worker from the same base was granted Agent Orange exposure. Accordingly, granting the same benefit for Petitioner would be both equitable and fair.

The use of Agent Orange in Laos occurred as shown in this document and was sanctioned by the U.S. Government. Agent Orange originated from a base under CIA control, which was Udorn. This proves again Petitioner's Service connection to Agent Orange.

Planes which were dropping Agent Orange, by the CIA in Laos, in the Vietnam theater which obtained repairs out of Udorn. These planes were serviced by large ground crews and at large bases, such as Udorn. Petitioner advises also that planes would be flown into Udorn off

sequence because they were shot and needed repair. In this situation barrels of Agent Orange would be seeping the toxic chemical from gun shots incurred by the injured planes. The workers, such as Petitioner, worked on these planes attempting to make them air worthy. An example of such a plane is one referenced in this series of documents, known as "Patches".

The VA can also follow shipments of Agent Orange through Mid Way, Bangkok, and Osaka, all areas Petitioner worked at, and which have had Agent Orange claims granted. The VA, in granting these prior awards, implicitly verified that Agent Orange was handled as carelessly there as it was on Johnson Island. Using either Petitioner's connection to Udorn, or the other duty stations, allows for Petitioner's Agent Orange claim to stand.

Petitioner has also shown that Diabetes Type II has been on the VA list since 2000 as related to Agent Orange Exposure. In 2006, for the VA to be so far behind in its work that Diabetes issues are erroneously claimed to not be on the VA list, was in error and so obviously incorrect as to verge on criminal negligence.

WHEREFORE, Petitioner requests a judgment against The United States in the amount of $1,800,000.00.

Respectfully submitted,

Jeffrey D. Moffatt, Attorney
U.S. Court of Federal Claims
Attorney for Petitioner Alan Janaskie

(661) 945-6121 / Fax (661) 945-3019
43625 N Sierra Hwy, Suite A.
Lancaster, CA 93534
E-mail Address: jeffreymbajd@hotmail.com

APPENDIX

Brigante v. United States, 35 Fed. Cl. 526, 529 (1996)
Burns v. Wilson, 346 U.S. 137 (1953),.
DOW CHEMICAL COMPANY, et al., PETITIONERS v. DANIEL RAYMOND STEPHENSON et al.
Hamdan v. Rumsfeld 05-184
***Murphy* v. *United States*, 45 F.3d 520, 522 (1st Cir. 1995),**
Polos v. United States, 231 Ct. Cl. 929
Sawyer v. United States, 930 F. 2d 1577.
10 U.S.C. 1201-21 (1992)
10 U.S.C. Section 1413(a)
**28 U.S.C. § 2671 Federal Tort Claims Act,**
28.U.S.C.S 1346 (a)(2) ("Little Tucker act)
28.U.S.C.S 149(a)(1) (" Big Tucker Act').
28 U.S.C. 1494, 2511 (1988).
**28 U.S.C. §§ 1346(b), 2674, 2675(a).**

38.C.F.R. 3.303, 3.304 (2005).
38 U.S.C.S. 101(16); 38 C.F.R. 3.1 (k), 3.303(a) (2005)
Back Pay Act, 5 U.S.C. § 5596 (1976).

**Fourteenth and Fifth Amendments**

A Geographic information System for Characterizing Exposure to Agent Orange and Other Herbicides in Vietnam, Environmental Health Perspectives, Volume 111, Number 3, March 2003 Stellman

Agent Orange in Laos: Documentary Evidence by Andrew Wells-Dang Expanded version, August 2002

Despite Critics, Defoliation Continues in Vietnam, Los Angeles Times, January 4, 1970, p. E10. Robert Kaylor

Documentary Flying Men, Flying Machines.

The Extent and patterns of usage of Agent Orange and other herbicides in Vietnam, 2003 Nature, Vol 422 , 17 April 2003, Stellman

Interview with Alfred McCoy, November 1991

"Une compagnie privee americaine participe a la lutte contra la guerilla,", Le Monde (Paris), April 20, 1968, p. 2. Jacques Decornoy;

TABS REPRESENT REFERENCES AND ACTUAL DOCUMENTS ATTACHED TO THE ORIGINAL VA SUBMITTED CLAIM.

Tab A. Project CHECKO Report, (Contemporary Historical Examination of Current Operations) Air Operations in Northern Laos, 1 Arpr, -1 Nov 70, 15 Jan 71, HQ PACAF, Prepared by Lt. Col Harry D. Blout,

Tab B. Aspects of the Health of Hawaii's Vietnam-era Veterans reflecting the impact of the Vietnam Experience, by Will Rellahan, Ph.D. Published by Research and Statistics Office, Hawaii State Department of Health, Issue No. 53, R & S Report, July 1985

Tab C. Wisconsin Vietnam Veteran Mortality Study, Proportionate Mortality Ratio Results, Standardized Mortality Ratio Results, Final Report, March 1986, Henry A. Anderson, M.D. State of Wisconsin Department of Health and Social Services.

Tab D. An Epidemiologic Investigation of Health Effects in Air Force Personnel following Exposure to Herbicides. Air Force Health Study, Epidemiology Research Division Armstrong Laboratory, Human Systems Division (AFSC) Brooks Air Force Base and Scripps Clinic and Research Foundation, March 1991, Program Manager R.W. Ogershok. Air Force Team Col William H. Wolfe M.D.

Tab E. Veterans, States ask for Supreme Court Review of Agent Orange Case, Agent Orange Coordinating Council, 1994, Admiral Zumwalt.

Tab F. Agent Orange Report VI, George Claxton, Lansing MI. 1986

Tab G. Vietnam- Era Veteran's Mortality Study, West Virginia Residents 1968-1983 Preliminary Report, 1986 Heydinger, M.D.

Tab H. Dr. Arthur Galson Lecture at Aovi National Convention, Stamford Ct. Oct 1982

Tab I. There may be a Diagnosis, Autoimmune Dysfunction in Vietnam Veterans, David Carter, 1993. Revised for presentation at the Center for Continuing Education University of Notre Dame Conference " THE UNITED STATES AND VIETNAM: FROM WAR TO PEACE."

Tab J. Analyzed Ranch Hand Data, chapters 3 and 4

Tab K. Canton Paper, Champion International Corporation, 1986. Heist

Tab L. Agent Orange, Iowa Survey of Vietnam Veterans. 1985, Iowa Department of Health

Tab M. Baseline Mortality Study Results, An Epidemiologic Investigation of Health Effects in Air Force Personnel following Exposure to Herbicides, USAF School of Aerospace Medicine, Brooks Air Force Base. 83. U.S. Department of Commerce. ADA 130-793.

Tab AAA. Air America: Beech/Vopar Turbo Beech 18, University of Texas at Dallas, June 2004.

Tab BB , pages 177 through 398. Air Commando Association.

Tab CC. The Extent and patterns of usage of Agent Orange and other herbicides in Vietnam, 2003 Nature, Vol 422 , 17 April 2003, Stellman

Tab 1 Agent Orange in Laos and Cambodia: documentary evidence, Indochina News Summer 2002

Tab 2.the Volpars, also referenced in this same tab, were equipped with aerial spray capabilities

Tab 3, Apollos Warriors , U.S. Air Force Special Operations during the Cold War, Micahel Has. Co. page 254

Tab 4. Drug Trafficking, Golem, VOXNYC

Tab 5, Heroin, Laos & the CIA, Colby

Tab 6. Appendix B, The U.S. Army in Thailand During the Vietnam Conflict

Tab 7, Ein Uberblick der Geschichte der Hochkulturen, Die weltanschauliche, by Dorrit Shindewolf. Page 521..

Tab 8, The POWs, CIA and Drugs , Uglier Truths Behind the Sarin Gas Stories, Michael Ruppert

Tab 9, Casualties of the CIA's War Against Communism, McCoy, Boston Globe, November 1996.

Tab 10, Casualties of the CIA's War Against Communism, McCoy, Boston Globe, November 1996 page 1.

Tab 11, Blond Ghost : Ted Shackley and the CIA's Crusades, by David Corn. 1994 page

Tab 12, Postmodern War: the New Politics of Conflict. by Chris Gray

Tab 13, Hmong International Human Rights Watch's Thamkrabok Support Group Proposal. Presented before the State Department's Bureau for Population, in Washington DC. October 15, 2003. page 1,

Tab 14 Killing Hope, by William Blum